Filed 4/27/23  P. v. Oliveros CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO HERNANDEZ OLIVEROS,<br><br>    Defendant and Appellant. | D079873<br><br><br>(Super. Ct. No. SCS315284) |

APPEAL from a judgment of the Superior Court of San Diego County, Enrique Camarena, Judge.  Affirmed.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman, Warren J. Williams, and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Eduardo Oliveros guilty of attempted murder (Pen. Code,[1] §§ 664, subd. (a) & 187, subd. (a), count one), robbery (§ 211, count two), and misdemeanor vandalism (§ 594, subds. (a) & (b)(2)(A), count three). The jury further found that Oliveros inflicted great bodily injury (§ 12022.7, subd. (a)) and used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) in connection with count one. Oliveros subsequently admitted allegations of a prior strike conviction under the Three Strikes law. (§§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i).) The trial court declined to strike the prior conviction and deadly-weapon enhancement, but it dismissed the great-bodily-injury enhancement and sentenced Oliveros to an aggregate determinate term of 17 years.

Oliveros contends on appeal that: (1) there was insufficient evidence to prove that he was not acting in self-defense; (2) there was insufficient evidence to prove that he intended to kill the victim, again because he was acting in self-defense; (3) the trial court prejudicially erred by precluding the defense from asking a law enforcement witness about his department's ban on carotid restraints; (4) the court prejudicially erred when it sustained a defense objection to a prosecution witness's comment and instructed the jury to disregard it, but declined to admonish the jury that the witness's comment was "inappropriate"; (5) the cumulative effect of the court's errors violated Oliveros's due process rights; (6) clerical errors in the sentencing minute order and abstract of judgment need to be corrected; and (7) the trial court should have applied section 1385, subdivision (c) (as revised by Senate Bill

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

2

No. 81, Stats. 2021 ch. 721)[2] in analyzing whether to dismiss Oliveros's strike conviction.

We conclude that substantial evidence supports the jury's implicit finding that Oliveros did not act in either perfect or imperfect self-defense when he stabbed the victim repeatedly with a screwdriver. We further conclude that the trial court did not prejudicially err by precluding questioning about carotid restraints on relevance grounds and pursuant to Evidence Code section 352;[3] nor did it prejudicially err in declining to admonish the jury that a witness's comment was "inappropriate." Because we find that the court did not err in the ways Oliveros contends, we reject his argument that the cumulative effect of any errors violated his due process rights. However, we agree with both parties that clerical errors in the sentencing minute order and abstract of judgment should be corrected. Lastly, we conclude that Senate Bill No. 81's revisions to Penal Code section 1385 do not apply to strike convictions because they are not "enhancements" falling within section 1385's ambit. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

One morning in September 2020, the victim, J. Jackson, was walking down San Ysidro Boulevard in San Diego. Oliveros waved him over and asked to borrow his phone. Jackson pulled out his phone and offered to call

---

[2]    Section 1385, subdivision (c), lists mitigating circumstances a trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the furtherance of justice. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 674 (*Sek*).)

[3]    Evidence Code section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

someone for Oliveros instead. Oliveros snatched Jackson's phone, and when Jackson reached to take it back, Oliveros punched Jackson in the face. Jackson responded by punching Oliveros three times in the face, and Oliveros took off running with Jackson's phone in his hand. Jackson chased Oliveros through an intersection where Oliveros threw the phone down onto the street, breaking it.

Jackson pursued Oliveros to a nearby 7-Eleven. Outside the store, Oliveros turned around to face Jackson and the two grappled with each other. During that struggle, Oliveros took a screwdriver he had in his pocket and stabbed Jackson several times in the back, torso, and neck. Jackson bled from his wounds, but in the moment he did not realize he had been stabbed. Jackson yelled for bystanders to call 911 while he punched Oliveros. At one point, Jackson pulled Oliveros's ponytail and "smashed" his head against the store window.

Jackson and Oliveros ended up inside the 7-Eleven where they continued their scuffle. When Oliveros attempted to leave the store, Jackson, a former Marine trained in mixed martial arts, placed him in a rear choke or "sleeper" hold from behind. Jackson then maneuvered on top of Oliveros, who began stabbing Jackson with the screwdriver again in his back, neck, and face. Jackson used other maneuvers to try to disarm Oliveros, but he was unsuccessful. Oliveros told Jackson, "Get off me or I'll stab you again." At that point, Jackson realized he was bleeding, so he stood up and backed away. Oliveros then got up, walked toward Jackson, and said, "let's go now" before stabbing Jackson again. Jackson pushed Oliveros back and threw a bottle of water at him, then walked out of the store.

Oliveros approached the store's front door from inside and stuck his tongue out towards Jackson. Oliveros then took a beverage from a cooler and

4

approached the store clerk, who was on the phone with 911. Oliveros threw the screwdriver at the clerk through a gap in a plastic barrier, then stood "staring" at the clerk until officers arrived. The clerk testified that Oliveros never appeared scared, never said he was scared, did not ask for help, and did not ask the clerk to call the police. Video footage from inside the store showed Oliveros smiling while the clerk was on the phone.

When police arrived, Jackson was outside the store, bleeding from his neck and falling in and out of consciousness. Jackson was treated at a local trauma center for a neck wound, lacerations to his lip and left ear, and superficial abrasions to his back. A trauma surgeon testified that Jackson's neck wound was "in a potentially very dangerous spot" near his carotid artery and jugular vein, which if punctured deeply enough, could result in strangulation.

The officer who arrested Oliveros observed that he seemed out of breath and had a "blank stare." The next day after the incident, Oliveros's booking photo showed no noticeable cuts, bruises, or other injuries to his face.

During an interview with law enforcement officers, Jackson said that he was angry at Oliveros, but was not afraid during the confrontation. He said that he was trying to get the screwdriver away from Oliveros "because [he] was going to stab [Oliveros] in the eye" and would have "just went to town on him." He told a detective that if Oliveros "didn't have that screwdriver, I'd probably still be beating his face in."

The People charged Oliveros with attempted murder (§§ 664, subd. (a) & 187, subd. (a), count one), robbery (§ 211, count two), and misdemeanor vandalism (§ 594, subds. (a) & (b)(2)(A), count three). The information further alleged that Oliveros inflicted great bodily injury (§ 12022.7, subd. (a)) and used a deadly and dangerous weapon (§ 12022, subd. (b)(1)) in

5

connection with count one. The jury found Oliveros guilty on all counts and also made true findings on the alleged enhancements.

Oliveros subsequently admitted allegations of the prior strike conviction. (§§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i).) In January 2022, the trial court declined to strike the prior conviction and the deadly-weapon enhancement, but it dismissed the great-bodily-injury enhancement and sentenced Oliveros to an aggregate determinate term of 17 years. Oliveros timely appealed.

DISCUSSION

I

Oliveros first contends there was insufficient evidence for the jury to find that he did not act in self-defense. More specifically, he argues that the jury could not reasonably have rejected his claim that he either reasonably or unreasonably believed he was in imminent danger of suffering great bodily injury when he used the screwdriver, and that he used no more force than reasonably necessary to defend against that danger. Oliveros also claims that because the evidence establishes that he acted in self-defense, it was also insufficient to support the intent to kill element of attempted murder.

We disagree. Substantial evidence supports the jury's implicit finding that Oliveros did not act in either perfect or imperfect self-defense when he stabbed Jackson.

*A. Governing Law*

For an attempted killing to be in self-defense, the defendant must actually believe in the need to defend. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*); *People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1232.) There are two types of self-defense under California law: "perfect" self-defense and "imperfect" self-defense. (*People v. Randle* (2005)

6

35 Cal.4th 987, 994.) "For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury." (*Ibid.*) A bare fear of the danger is not enough—"the circumstances must be sufficient to excite the fears of a reasonable person, and the party [attempting to] kill[] must have acted under the influence of such fears alone." (§ 198; see *People v. Flannel* (1979) 25 Cal.3d 668, 675.)

Imperfect self-defense in this context requires evidence showing the defendant attempted to kill another person " 'because the defendant *actually, but unreasonably*, believed he was in imminent danger of death or great bodily injury . . . .' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1048, first italics in original, second italics added.) In contrast to perfect self-defense, imperfect self-defense is not a true affirmative defense; it is shorthand for a theory of voluntary manslaughter. (*People v. Barton* (1995) 12 Cal.4th 186, 199–201.)

"The subjective elements of self-defense and imperfect self-defense are identical[,]" and under each theory the defendant "must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) Neither perfect nor imperfect self-defense may be "invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 (*Christian S.*).) Also, for either type of self-defense to apply, "the fear must be of imminent harm." (*Humphrey*, *supra*, 13 Cal.4th at p. 1082.) A fear of future harm will not suffice no matter how great the

fear and likelihood of harm.  (*People v. Landry* (2016) 2 Cal.5th 52, 97–98; *People v. Manriquez* (2005) 37 Cal.4th 547, 581–582.)

On review, we must " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.)  We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### B. Analysis

Substantial evidence supports the jury's implicit finding that Oliveros did not actually believe, reasonably or unreasonably, that he was in imminent danger of death or great bodily injury.  At the point when Oliveros first stabbed Jackson several times outside the 7-Eleven, the parties had only been grappling and exchanging punches.  Video footage, still shots, and witness testimony all confirmed that the scuffle only involved the parties' fists and bodies at the time Oliveros escalated the conflict by using a deadly weapon.  Unlike in other cases in which deadly force was deemed potentially justified in response to non-deadly force, there is no indication in the record that Oliveros was uniquely vulnerable, physically or mentally, such that

8

someone in his position " 'would more readily believe he was in imminent danger.' " (*People v. Horn* (2021) 63 Cal.App.5th 672, 683 [collecting cases involving defendants asserting self-defense who have physical or other vulnerabilities]; see, e.g., *Humphrey, supra,* 13 Cal.4th at p. 1088 [evidence of battered women's syndrome relevant to defendant's belief regarding imminent danger]; *People v. Smith* (1907) 151 Cal. 619, 626–629 [defendant's physical condition relevant in determining whether belief in need for self-defense was reasonable].) Jackson's relatively small stature would have given Oliveros no apparent reason to believe that Jackson would pose an obvious threat of great bodily injury in a fistfight. (See *Smith*, at pp. 627–628 [disparity in relative physical condition is relevant to self-defense].)

Even after Jackson attempted to use his training in mixed martial arts to subdue Oliveros, a rational factfinder could still conclude that those maneuvers did not cause Oliveros to believe, reasonably or otherwise, that he was in imminent danger of great bodily injury. There was no evidence that Jackson was ever armed during the fight, and witness testimony supported the conclusion that Oliveros did not fear he was in danger. (See *People v. Valencia* (2008) 43 Cal.4th 268, 288, fn. 6 [if defendant unreasonably believed victim "was going to punch him in the arm and stabbed him to death in response, this belief would not support a claim of imperfect self-defense for the reason that the belief, even if reasonable, would not permit the use of deadly force"]; cf. *People v. Rogers* (2006) 39 Cal.4th 826, 884 [imperfect self-defense instruction unnecessary where defendant had a gun and the victim was unarmed].) Witnesses testified that Oliveros did not appear scared, never said he was scared, did not ask for help, and did not ask anyone to call the police. He apparently emerged from the altercation largely unscathed, with no noticeable cuts, bruises, or other injuries to his face. Video footage

and a still image from inside the store even showed Oliveros sticking his tongue out and smiling while the clerk was calling 911. Furthermore, the fact that Oliveros re-engaged with Jackson and stabbed him again—after Jackson backed away inside the store—undercuts any inference that Oliveros used the screwdriver out of fear of imminent danger. (Cf. *People v. Pinholster* (1992) 1 Cal.4th 865, 966 ["right of self-defense does not extend beyond the time of real or apparent danger"]; *People v. De Leon* (1992) 10 Cal.App.4th 815, 825 [no substantial evidence for imperfect self-defense instruction where defendant was "firing at men who had turned and started to walk away"].)

The fact that Oliveros was the instigator of the fight also supports the jury's implicit finding that he did not act in self-defense. (See *Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) As noted, a defendant cannot invoke self-defense when, "through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony)," he has "created circumstances under which his adversary's attack or pursuit is legally justified." (*Ibid.*) Here, Oliveros created such circumstances by stealing Jackson's phone, punching him in the face before Jackson threw a punch, and then escalating the conflict by using a screwdriver to stab Jackson repeatedly.

Thus, viewing the evidence in the light most favorable to the verdict, we conclude there is substantial evidence to support the jury's finding that Oliveros did not believe he was in danger of great bodily injury when he used deadly force against Jackson. Because we reach this conclusion, we reject

Oliveros's related contention—also premised solely on self-defense—that there was insufficient evidence to prove his intent to kill.[4]

II

We turn next to Oliveros's argument that the trial court prejudicially erred by precluding the defense from asking a law enforcement witness about his department's ban on carotid restraints. We conclude that the trial court did not abuse its discretion by excluding that line of questioning on relevance grounds and because its probative value was outweighed by undue time consumption and the danger of confusing the jury. (See Evid. Code, § 352.) We also conclude that even if there was error, it was not prejudicial.

By way of additional background, when a responding San Diego Police Department (SDPD) officer testified at trial, defense counsel asked on cross-examination whether SDPD had recently prohibited officers from using "a technique known as a carotid restraint to detain and perhaps effectuate an arrest[.]" The prosecutor objected, and during a sidebar outside the presence of the jury, defense counsel argued that he should be allowed to present evidence that Jackson's use of a choke hold during the incident was an unreasonable use of force. The defense contended that evidence of SDPD's prohibition of carotid restraints was necessary to counter the People's argument, previewed earlier in the proceedings, that common law allowed for Jackson to effectuate a citizen's arrest under section 837.[5] The prosecutor

---

[4]    Oliveros does not contend that there is insufficient evidence of intent to kill even if the jury could reasonably have concluded that he was not acting in self-defense.

[5]    Section 837 provides: "A private person may arrest another:
"1. For a public offense committed or attempted in his presence.
"2. When the person arrested has committed a felony, although not in his presence.

11

argued in response that SDPD policies were irrelevant to determining what force Jackson, a private citizen, could lawfully use in those circumstances. He also argued that even if such policies were somehow relevant, the officer was not an expert on the use of reasonable force in this context.

The trial court sided with the People and found that SDPD policies regarding carotid restraint were irrelevant because Jackson was not a law enforcement officer. The court also found that allowing questions about law enforcement policies might lead the jury to speculate about why SDPD made certain policy decisions, which would be irrelevant to whether Jackson's use of force was reasonable.

We apply an abuse of discretion standard to review the trial court's rulings determining the relevance and admissibility of evidence. (*People v. Green* (1980) 27 Cal.3d 1, 24–25; *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1334.) The court abuses its discretion in deciding whether to admit evidence only when it acts in an "arbitrary, capricious, or patently absurd manner that result[s] in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Only relevant evidence is admissible (Evid. Code, § 350), and "[t]he trial court has broad discretion . . . in determining the relevance of evidence" (*People v. Horning* (2004) 34 Cal.4th 871, 900). " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Here, we conclude that the trial court did not abuse its discretion by precluding the defense from probing SDPD's policies on carotid restraint.

---

"3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

Any underlying reasons for SDPD's policy changes bore little relation to whether Jackson, a private citizen—engaging with an individual who had just stolen his phone, punched him in the face, and then stabbed him with a screwdriver—used reasonable force during the ensuing fight. As the People point out, the trial court could reasonably have concluded that allowing the defense to explore department-wide decisions regarding the use of carotid restraints would likely lead to confusing and time-consuming discussions of medical, social, and policy issues—as well as potential disputes over whether Jackson's moves were equivalent to the use of a carotid restraint. Moreover, the mere existence of the SDPD policy proved nothing without non-speculative evidence as to the reasons why it was enacted, and there was no showing that the testifying officer was competent to testify to those reasons. We cannot say in these circumstances that excluding such evidence was arbitrary, capricious, or patently absurd.

We also reject Oliveros's argument that precluding this line of questioning undermined his constitutional right to present a defense. " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present a defense. Courts retain . . . a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]' " (*People v. Cudjo* (1993) 6 Cal.4th 585, 611.) The trial court exercised that power here and explained why admitting irrelevant evidence regarding SDPD policies would cause undue speculation and prejudice.

Moreover, the defense was still able to, and did in fact, use other evidence unrelated to SDPD policies to argue at length that Oliveros acted in self-defense against Jackson's use of mixed martial arts techniques. For

13

example, in his closing argument, defense counsel referenced Jackson's training as a marine, Jackson's interview statements about wanting to hurt Oliveros, and the fact that Jackson put Oliveros "in this rear naked chokehold[]" that "can make a person pass out." Oliveros was thus still able to present his asserted defense that Jackson's use of force was unreasonable, even without the excluded evidence regarding SDPD policies. (See *People v. Anderson* (2012) 208 Cal.App.4th 851, 881–882 [no constitutional violation because excluding evidence was not a " 'refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense' " and the excluded evidence was "only marginally relevant"].)

Finally, even if the court somehow erred in excluding evidence on the SDPD's carotid restraint policy, any error would be harmless under the applicable *Watson* standard, which inquires whether it is reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Earp* (1999) 20 Cal.4th 826, 880 [applying *Watson* standard to erroneous exclusion of evidence].) Oliveros's defense centered on an asserted belief that "he was in imminent danger of death or great bodily injury[,]" which for the reasons noted above, the jury had ample reasons to reject. Even assuming the maneuver Jackson employed inside the store was comparable to a carotid restraint, the evidence is undisputed that Oliveros was the original assailant and that Jackson used the maneuver only *after* Oliveros had already stabbed him several times in the back, neck, and face. In these circumstances, it is not reasonably probable that the jury would have reached a verdict more favorable to Oliveros if it had known of SDPD's carotid restraint policy.

14

For all these reasons, we conclude that the court did not prejudicially err in preventing the defense from eliciting testimony about SDPD policies on carotid restraint.

## III

Oliveros next argues that the court prejudicially erred when it sustained a defense objection to a prosecution witness's comment and instructed the jury to disregard it, but decided against admonishing the jury that the comment was "inappropriate." Again, we disagree.

For context, an investigator for the San Diego County District Attorney's office testified about still images taken from video surveillance inside and outside the 7-Eleven. At one point, the investigator described an image depicting the moments after Jackson exited the store to wait for police to arrive. The investigator said the image showed Oliveros approaching the front door facing the parking lot, and that "[h]is tongue [was] sticking fully out of his mouth, towards his chin, like, a – similar to, like, a Joker in Batman." The trial court sustained defense counsel's objection and granted his motion to strike.

During a subsequent break outside the presence of the jury, defense counsel moved for a mistrial, arguing that the investigator's reference to the Joker constituted prosecutorial misconduct. The prosecutor responded that the brief reference to a fictional villain did not warrant declaring a mistrial, and that the court could provide an additional curative instruction to the jury if needed. After considering some case law cited by the defense, the court found those cases distinguishable, in part because they involved the prosecutor making longer or more extreme comparisons during closing arguments. The court agreed to further admonish the jury that the comment should be ignored, but the defense requested that the court specifically say it

15

was "inappropriate." The court denied that request, finding that if the court were to remark on the appropriateness of the witness's testimony, the jury might interpret that remark as commentary on the evidence. When the jurors returned, the court told them to ignore "the comment about the Joker" and reminded them that it was stricken from the record.

Oliveros contends on appeal that the court erred by merely instructing the jurors to disregard the Joker reference, and declining to tell them in addition that the comment was "inappropriate." He argues that prosecutors should refrain from comparing defendants to historic or fictional villains, and that the circumstances called for a "stronger admonishment" than the one the court gave.

We disagree. As an initial matter, the prosecutor did not make the comment himself, and there is no indication he intentionally elicited the testimony. (See *People v. Chatman* (2006) 38 Cal.4th 344, 379–380 (*Chatman*) [" 'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct.' "].) In the questioning leading up to that point, the prosecutor had been asking the investigator to describe the parties' actions and appearances as depicted in video footage and still images admitted into evidence. The image at issue was one of many, and after the investigator said that Oliveros appeared to be "putting his tongue out" in the image, the prosecutor asked the investigator to elaborate on "the position of [Oliveros's] tongue and mouth[.]" The investigator, not the prosecutor, volunteered the comparison to the Joker only after first stating that Oliveros's tongue was "sticking fully out of his mouth, towards his chin[.]"

It is thus unclear whether the issue is properly considered one of alleged prosecutorial misconduct or improper admission of evidence. (See

16

*Chatman*, *supra*, 38 Cal.4th at pp. 379–380.) "Defendant cites no authority for the proposition that, simply by answering an attorney's questions, a witness commits misconduct that could require reversal of the resulting conviction." (*People v. Mills* (2010) 48 Cal.4th 158, 198 (*Mills*).) Also, " 'a prosecutor cannot be faulted for a witness's nonresponsive answer that the prosecutor neither solicited nor could have anticipated. [Citation.]' " (*People v. Molano* (2019) 7 Cal.5th 620, 674; see also *People v. Valdez* (2004) 32 Cal.4th 73, 125 [no misconduct where "the prosecutor did not intentionally solicit, and could not have anticipated," the witness's testimony].) However, because Oliveros and "the cases generally discuss the issue under the rubric of misconduct, we will do so also." (*Chatman*, at p. 380.)

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.]" (*People v. Gonzales* (2011) 52 Cal.4th 254, 305.) "The 'critical inquiry on appeal is not how many times the prosecutor erred but whether the prosecutor's errors rendered the trial fundamentally unfair or constituted . . . reprehensible methods to attempt to persuade the jury.' [Citation.]" (*People v. Peoples* (2016) 62 Cal.4th 718, 794 (*Peoples*).)

We conclude that—even if fairly attributable to the prosecution—the investigator's "brief and fleeting reference[]" to the Joker "[was] not so intemperate, egregious, or reprehensible as to constitute prosecutorial misconduct under state law or federal constitutional law" (*Mills*, *supra*, 48 Cal.4th at p. 199), and the court's instructions were sufficient to cure any

17

potential prejudice. The court properly instructed the jurors that the comment was stricken and that they should ignore it, and jurors are presumed to understand and follow the instructions they are given. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Before closing arguments, the court further instructed the jurors that if it had sustained an objection to a question or "order[ed] testimony stricken from the record, you must disregard it and you must not consider that testimony for any purpose." (See *Mills*, at p. 199 ["[W]e must assume the jury followed the trial court's instruction not to consider testimony that was the subject of a successful objection."]; CALCRIM No. 222.) The jury was thus instructed, in multiple ways and at different times, to disregard the Joker comparison. Oliveros cites no authority that a trial court in these circumstances must go beyond sustaining the objection and instructing the jury to disregard such a comment.

While the Joker comment was inadmissible, Oliveros cannot show he was prejudiced by the court's admonition, "especially where, as here, [his] objection to it was correctly sustained at trial." (*Peoples*, *supra*, 62 Cal.4th at p. 794.) The prosecutor did not persist in his line of questioning after the objection was sustained and did not refer to the comment in closing arguments. (Cf. *Mills*, *supra*, 48 Cal.4th at p. 198 [no prosecutorial misconduct even after court sustained objections to prosecutor's questions and "the prosecutor made two more unsuccessful attempts" to elicit inadmissible information "before abandoning the attempt[]"].) The investigator's comment was brief and not "unlinked to the evidence" in a way that would increase its prejudicial impact. (See *People v. Jackson* (2016) 1 Cal.5th 269, 350 [prosecutors should refrain from comparisons "especially where the comparisons are wholly inappropriate or unlinked to the evidence[,]" but prejudice is lessened when "improper statements spanned a

18

relatively small amount of time"].)  Moreover, the jurors had the opportunity to examine the images and video footage themselves to draw their own conclusions about Oliveros's demeanor after the fight ended.

Accordingly, we conclude that the court did not err by instructing the jury to disregard the comment without also admonishing it that the comment was "inappropriate."

IV

In light of our determination that the trial court did not commit any individual error, we conclude there was no violation of Oliveros's due process rights from any cumulative error.  However, we agree with the parties that clerical errors in the sentencing minute order and the abstract of judgment need correcting.  Specifically, for Oliveros's second-degree robbery conviction, the court imposed a consecutive term of one-third the midterm of three years (in other words, one year), doubled to two years for Oliveros's prior strike. (§§ 211, 213, subd. (a)(2), 667, subds. (b)-(i).)  The minute order and abstract of judgment inaccurately indicate the court imposed an upper-term sentence. (See *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 ["[t]he record of the oral pronouncement of the court controls over the clerk's minute order[]"].)  Thus, the trial court should correct the sentencing minute order and abstract of judgment to reflect the court's oral pronouncement.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 188 [where discrepancy exists between abstract of judgment, reporter's transcript, and trial court's minute order, appellate court should order trial court to make correction].)

V

Lastly, Oliveros argues that the trial court was obligated to consider any applicable mitigating circumstances listed in newly revised section 1385, subdivision (c), in deciding whether to dismiss his prior strike conviction

19

under the Three Strikes law (§§ 1170.12, subds. (a)-(d) & 667, subds. (b)-(i)). The People argue in response that the recent revisions to section 1385 did not impact the court's consideration of Oliveros's prior strike because the Three Strikes law establishes an alternative penalty scheme, not an enhancement. For the reasons below, we agree with the People.

Senate Bill No. 81 became effective on January 1, 2022, and amended section 1385 to specify factors that a trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice. (*Sek*, *supra*, 74 Cal.App.5th at p. 674; see Stats. 2021, ch. 721, § 1.) Specifically, section 1385, subdivision (c)(1) now provides that "the court shall dismiss an *enhancement* if it is in the furtherance of justice to do so," and subdivision (c)(2) states that "[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence" of nine listed "mitigating circumstances," any one of which "weighs greatly in favor of dismissing the *enhancement*, unless the court finds that dismissal of the *enhancement* would endanger public safety." (Italics added.)

As our Supreme Court has explained, the Three Strikes law "articulates an alternative sentencing scheme for the current offense *rather than an enhancement*. [Citation.]" (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 527, italics added.) The Three Strikes law is distinguishable from an enhancement in that it does not add an additional term of imprisonment to the base term, but rather provides for an alternate sentence when qualifying prior convictions are proven. (*People v. Williams* (2014) 227 Cal.App.4th 733, 744.) We presume the Legislature, when it passed Senate Bill No. 81, was aware of the distinction drawn by our courts between the Three Strikes law as an alternative sentencing scheme and an enhancement. (See *People v. Blakeley* (2000) 23 Cal.4th 82, 89 ["the Legislature is presumed

20

to have known of and to have acquiesced in the previous judicial construction" when amending a statute].) Accordingly, we conclude that because a prior strike conviction is not an enhancement and does not come within the provisions of amended section 1385, subdivision (c), remand for resentencing is not required on this basis.[6] (See *People v. Burke* (2023) 89 Cal.App.5th 237, 242–244.)

---

[6] The People requested that we take judicial notice of Senate Bill No. 81's legislative history. However, legislative history is generally appropriate only when the language of the statute is ambiguous. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 29.) Because the language of section 1385 is clear and unambiguous, we follow its plain meaning. (See *Hughes v. Pair* (2009) 46 Cal.4th 1035, 1046 [if statutory language "is susceptible of only one meaning," courts presume the Legislature meant what it said, and the plain meaning of the statute controls].) Accordingly, we deny the People's motion to take judicial notice of Senate Bill No. 81's legislative history.

## DISPOSITION

The trial court is directed to amend the sentencing minute order dated January 5, 2022, and the abstract of judgment, in a manner consistent with this opinion. The trial court shall forward the corrected abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

IRION, Acting P.J.

DATO, J.

22